NOTICE

This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210472-U

NO. 4-21-0472

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 18, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Woodford County |
| DAVID W. PRATHER, | ) | No. 20CF114 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The recording of a telephone call in which defendant urged the protected party to request the cancellation of an order of protection was a bad act uncharged in the present case but nevertheless was relevant and admissible to prove defendant's knowledge of the order of protection.

        (2) Given defendant's extensive criminal history and the fact that he violated the order of protection on four occasions, a prison term six months short of the statutory maximum was not an abuse of discretion for violation of an order of protection, a subsequent offense (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)).

¶ 2    In the circuit court of Woodford County, a jury found defendant, David W. Prather, guilty of a single count of violating an order of protection, a subsequent offense (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)). The court sentenced him to imprisonment for 5½ years.

¶ 3    Defendant appeals on two grounds. First, he claims the circuit court admitted in evidence other bad acts by allowing the State to present evidence that he violated the order of protection not only on August 16, 2020, as charged in the present case, but also on August 15,

2020. See Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). Second, defendant claims the sentence of 5½ years' imprisonment is too severe.

¶ 4    We find no abuse of discretion in the circuit court's evidentiary ruling or in the length of the prison sentence. Therefore, we affirm the judgment.

¶ 5                                    I. BACKGROUND

¶ 6    On August 16, 2020, according to an indictment, defendant committed violation of an order of protection, a subsequent offense (720 ILCS 5/12-3.4(a)(1)(i) (West 2020)), in that,

> "having been served with notice of the contents of an order of protection, 20-OP-61, issued on July 28, 2020, by the Circuit Court of Woodford County pursuant to the Illinois Domestic Violence Act [of 1986 (750 ILCS 60/101 *et seq.* (West 2020))], [he] did knowingly commit an act which was prohibited by the order of protection in that said defendant, through a third party, called Amanda Krutke, a protected party[,] and having been previously convicted of domestic battery on December 5, 2019[,] in Woodford County Case 19-CM-88."

¶ 7    On March 15, 2021, the circuit court held a pretrial hearing. The court noted that in addition to the present case, which charged defendant with telephonically violating the order of protection on August 16, 2020, a similar case was pending, Woodford County case No. 20-CF-113, which charged him with telephonically violating the order of protection on August 15, 2020. Both cases were set for a jury trial, and the court observed that no motion had been filed to try them together. The prosecutor responded that because the dates of the offenses were different, he intended to try the cases separately. Defense counsel, on the other hand, said it had been his understanding that the two cases would be tried together. The court decided that since no motion had been filed to consolidate the two cases for trial, the two cases would be tried separately.

¶ 8        In the jury trial in this case, the first thing the prosecutor did, after opening statements, was move to publish People's exhibit No. 1 to the jury. This exhibit was the protective order. Defense counsel objected because People's exhibit No. 1 was not the document that was served on his client.

¶ 9        In addition to People's exhibit No. 1, the prosecutor explained, he intended to present People's exhibit No. 2, which was the copy of the protective order with the return filled out that the serving police officer had faxed back to the prosecutor's office. Parts of this faxed copy were blurred and unreadable, whereas People's exhibit No. 1 was a readable copy. Defense counsel objected to the implication that that the copy of the order served on his client was completely legible like People's exhibit No. 1. "What copy is now being shown to the jury," defense counsel remarked, "is a readable copy, which would have been nice, but it never happened."

¶ 10       Even so, the circuit court observed, the State had to begin by proving that a protective order containing a no-communication directive existed. People's exhibit No. 1 tended to so prove. Therefore, the court overruled defense counsel's objection to People's exhibit No. 1. As for whether defendant was served a legible copy, the court added, "[t]hat's going to be for the jury to figure out." Defense counsel said that, on that understanding, his concern was allayed. Accordingly, when the jury returned to the courtroom, the court granted the prosecutor's motion to publish People's exhibit No. 1. The court also admitted People's exhibit No. 2 in evidence.

¶ 11       The State then called Derek Suttles. He testified he was a patrol deputy with the Morgan County sheriff's department and that on July 28, 2020, at Gateway Drug and Alcohol Treatment Center (Gateway) in Jacksonville, Illinois, he served upon defendant an order of protection. According to Suttles's testimony, he read to defendant the order of protection—or at

least the preprinted language that was checkmarked and any language the judge had written in—and that at the completion of the reading he asked defendant if he had any questions. Suttles identified People's exhibit No. 4 as "a service card that is prepared for all of our order of protections or civil services in general." He testified he had watched defendant sign this service card.

¶ 12        On cross-examination, defense counsel asked Suttles:

"Q. Officer Suttles, what documents did you serve on my client that date?

A. The order of protection packet.

Q. What does that consist of?

A. The order of protection that was issued by the judge of the issuing county.

Q. And how many pages is that?

A. They differ from county to county and from case to case.

Q. Well, I want to know in this county how many pages was that?

A. I don't know. I don't work for this county."

¶ 13        To refresh Suttles's memory, defense counsel handed People's exhibit No. 2 to Suttles, asking him if he recognized the document. Suttles acknowledged having seen the document before. It consisted of 14 pages. Therefore, Suttles agreed, the document he served upon defendant must have been 14 pages long. One part of People's exhibit No. 2, Suttles further agreed, was illegible—a "black box."

¶ 14        Defense counsel asked him:

"Q. But you read him word for word as it's printed on that Exhibit number 2?

A. I would have, sir, yes.

Q. And you read it exactly that way?

A. Yes.

Q. Okay. Do you recall in this case specifically reading parts of it to my client; is that correct?

A. Yes, sir.

Q. Okay. And you wouldn't have changed or altered any parts of it, would you?

A. No, sir.

Q. You would have read it word for word, correct?

A. Yes, sir.

Q. Did you tell my client—or do you recall at this time telling my client not to communicate with any third parties?

A. Yes. I would have told your client that.

Q. How would you have told him that?

A. That's in the order, I believe.

Q. Where in the order is it? Show me.

A. I will have to look.

Q. You—

A. It's a typical order of protection.

Q. I didn't say that. Where in the order is it? Just point it out for us.

A. I don't see it in this one."

¶ 15    On redirect examination, Suttles testified that when serving an order of protection, he did not keep for his own records a copy of the order. People's exhibit No. 2, he explained, was "not the copy [he] actually read to [defendant]." Possibly, the blocks of text that were illegible in People's exhibit No. 2 were "more visible on the one [that Suttles] read to [defendant]." Suttles testified that, in any event, whenever he served an order of protection, he always explained the impermissibility of third-party communication with the protected party. "Every time I serve an order of protection," he said, "I explain to the respondent that they can't have any third-party contact, whether it be Facebook, through a brother, sister, cousin, extended relative, any social media. I explain that to them each time."

¶ 16    On recross-examination, defense counsel asked Suttles:

Q. Okay. So which is it? You give this—your litany, or you read it word for word?

A. I read it word for word whatever is on there in the printed, checked box, next to the checked box, along with what is written in by—I would assume every case the judge. And then I at the end of it say do not have any third-party contact. Because that seems to get most people jammed up, is the third-party contact.

* * *

Q. So that's something you always add; is that correct?

A. I feel it's a safe thing to add, yes."

¶ 17    The State next called Joshua Keim. He testified he was the deputy superintendent of the county jail in Eureka, Illinois, and that he recognized defendant as "having been held in the jail." When defendant was in the jail, Keim became aware of an order of protection that had been issued against defendant. Whenever an inmate was subject to an order of protection, Keim testified,

the jail had a "protocol": "[w]e block phone calls, we block e-mails, video visits and stuff like that." The jail had a communications system that could be programmed to block calls from inmates to protected parties. The system also recorded each inmate's calls and video visits. Keim had access to these recordings.

¶ 18    The prosecutor asked Keim:

"Q. Do you recall finding any phone calls in which the defendant had contact with the protected party in this case?

A. On 8-15 and 8-16. There's three calls on 8-15—"

¶ 19    Defense counsel objected. Outside the jury's presence, he explained his reason for objecting:

"[Keim's] answer was October 15th and October 16th, 2020 [*sic*]. We had a trial on the phone calls on October 15th, 2020 [*sic*], a couple months ago.

***

I don't think we should tell the jury he's done it repetitively because the court split this case into two for some reason. I didn't quite understand it. But I take it it was to restrict evidence. One case is one evidence, another case is the other evidence. You're not going to mix the two."

¶ 20    The circuit court disagreed it was the court that had split the cases. The court explained, "Cases get filed. I have no control over how cases get filed. And until somebody asks me to do something different, I don't. But they are separate events." The court then asked for the prosecutor's response to defense counsel's objection.

¶ 21    The prosecutor began by correcting defense counsel, pointing out that the month when defendant made the phone calls was August 2020, not October 2020. (Defense counsel

agreed.) The prosecutor then made the following argument for the relevance of the phone calls that defendant made on August 15, 2020:

> "[T]he August 15th phone calls clearly demonstrate that the defendant knew that there was an order of protection in place. In fact, on the August 15th phone calls he talks about her removing the order of protection. So it goes towards the knowledge element of whether he knew there was an order of protection in place or not."

Thus, in the prosecutor's view, the August 15, 2020, phone calls were relevant in that they tended to prove defendant's knowledge that an order of protection was in force.

¶ 22 The circuit court agreed with the prosecutor that the August 15, 2020, phone calls were relevant for that purpose. The court ruled:

> "Then it's admissible. If it goes to some issue that's relevant in this case, it can be admissible. The question then becomes is it prejudicial, and is it substantially beyond what it should be prejudicial, and it's not. It is—especially as to knowledge, which is the cornerstone of this case, is the issue of this case, is the defendant's knowledge regarding him having contact. So I'm going to admit it."

¶ 23 When the jury returned to the courtroom, the circuit court announced that defense counsel's objection was overruled. The prosecutor continued his direct examination of Keim:

> "Q. Were you able to determine if there was any contact between the defendant and the protected party?
>
> A. Yes.
>
> Q. How were you able to determine that?
>
> A. Through the video visit phone calls. On 8-15 there was three, and 8-16 there was one."

¶ 24　　　　Through the voice recognition system in the jail and because of Keim's previous contacts with defendant, Keim was able to recognize defendant's voice in the video phone calls. Likewise, from having "listen[ed] to video visits and phone calls," Keim was able to recognize Krutke's voice in the recordings. Also, from "all the frequent contact that [defendant] has had with [Krutke]," Keim was able to match Krutke's voice to her face. The prosecutor asked Keim:

"Q. And is there any requirement for IDs or anything like that?

A. Yeah. They have to prove a valid picture and ID. Should be a driver's license.

Q. Okay. And that's to use the video visit system?

A. Correct.

Q. So you've listened to those phone calls on 8-15 and 8-16, and you were able to identify that [defendant] was on and Ms. Krutke was on; is that correct?

A. Correct.

Q. [And] there [were] other people on there?

A. Somebody named KiKi.

Q. Okay. And but the majority of the phone calls, who are they between?

A. [Defendant] and Ms. Krutke."

¶ 25　　　　Keim identified People's exhibit No. 3 as audio recordings of the video phone calls that defendant made from the jail on August 15 and 16, 2020. Thus, all the phone calls of August 15 and 16, 2020, were lumped together in People's exhibit No. 3. The prosecutor moved to admit People's exhibit No. 3 in evidence. The circuit court asked defense counsel if he had any objection to the admission of this exhibit. To decide whether he had an objection, defense counsel requested to ask Keim a question. The court gave him permission. Defense counsel asked Keim:

"Q. Are the recordings for August 15th or August 16th, or both?

A. Both.

MR. MORRIS: Okay. Knowing that answer I will object for the record. Thank you.

THE COURT: All right. Overruled. They're admitted. Or it's admitted. Do you wish to publish that?

MR. GIBSON [(PROSECUTOR)]: Oh, sorry, Judge. I would move to publish to the jury. I apologize.

THE COURT: Any objection to publishing it?

MR. MORRIS: Just my continuing objection. That's all.

THE COURT: Okay. You may publish.

¶ 26    After People's exhibit No. 3 was published (or played) for the jury, the prosecutor asked Keim:

"Q. Who just said, 'Hey, KiKi'?

A. [Defendant].

Q. Who was that just said hello, the female voice?

A. Amanda Krutke.

Q. *** Deputy Superintendent Keim, *** if phone calls are blocked, how did that phone call go through between [defendant] and Ms. Krutke?

A. Through a three-way call.

Q. And is that a—was that a way to get around the blocking on the system?

A. Yes.

Q. And at some point does it realize that it's been worked around?

A. Usually, like, after 12 or 17 minutes it blocks the call.

Q. If it—

A. If it recognizes it.

Q. Recognizes what?

A. Somewhere around it. Like, a three-way caller.

* * *

Q. And, obviously, there at the end we heard a message from the Securis automated system. Was that what you were talking about as far as terminating for third-party calls?

A. Correct. It caught it."

¶ 27 On cross-examination, defense counsel asked Keim:

"Q. And you know that if [inmates] make a third-party phone call that the charges are to the person they included in the phone call, correct?

A. Correct.

Q. Yeah. And so people without money elect to do that to communicate to their loved ones; is that correct?

A. I guess that could be correct, yes.

Q. Yeah. That way they don't have to pay for the call?

A. Correct."

¶ 28 After Keim's testimony, the State rested. Defense counsel moved for a directed verdict, arguing that Keim had made an inadequate identification of Krutke's voice in the phone calls. The circuit court denied the motion.

¶ 29          Defendant then took the stand in his own behalf. He testified that in July 2020, when he was confined in the Woodford County jail, he was indeed served with the order of protection. He further admitted being served with the order of protection a second time, when he was in rehabilitative treatment at Gateway. But he did not recall Suttles's reading the order of protection to him. He just recalled Suttles's asking him to sign it. His encounter with Suttles at Gateway was brief, lasting only two or three minutes.

¶ 30          Defense counsel asked defendant:

"Q. Did [Suttles] ever tell you you couldn't communicate with third parties?

A. No, he did not.

* * *

Q. Did you ever go to court to learn about the order of protection?

A. No.

Q. Did you ever talk to a judge about it?

A. No.

Q. Now, so what did you rely upon in order to know what you could or could not do after the order of protection was served on you?

A. Just from what I could understand from reading the order of protection itself."

¶ 31          Defense counsel then showed defendant People's exhibit No. 2, asking defendant if he had seen it "or any similar document" before. Defendant answered in the affirmative. It had been served upon him. The trouble was, the defense pointed out, the order of protection contained a grammatical error (which was present in People's exhibit No. 1 as well). The order read, " '[R]espondent shall not have any communication petitioner [*sic*] and stay away from petitioner

- 12 -

at all times.' " Defendant admitted having communication with "petitioner," that is, with Krutke, but he testified it was unclear to him, from the order of protection, that he was forbidden to communicate with her. "Well, basically, I mean, really it's kind of misleading," defendant claimed. "It's not very clear at all."

¶ 32        The reason for the three-way calls, defendant explained, was merely to shift the cost of the calls to his parents. Defense counsel asked him:

"Q. Okay. Now, when you—why did you make a third-party phone call to Amanda Krutke on August 15th and August 16th, 2020?

A. Because I didn't have—I didn't have the money to pay for the call. So I called my parents—I called my parents' house so they could pay for the call.

* * *

Q. Now, did someone else prompt you to make the phone call, like your mother?

A. Yes.

Q. Okay. Was anyone or anything else informing you that—at any time that you could not communicate with Amanda Krutke?

A. No."

¶ 33        On cross-examination, the prosecutor asked defendant:

"Q. So your contention is there is a word missing [in the sentence 'Respondent shall not have any communication petitioner and stay away from petitioner at all times']?

A. Correct.

Q. So that based on that one word missing you can't tell what that means?

A. Correct.

Q. Okay. During the course of your phone call that we heard with Ms. Krutke you instructed her to get rid of the order of protection; is that correct?

A. Correct."

¶ 34    In its case in rebuttal, the State presented People's exhibit No. 5, a certified copy of a court record showing that within the last 10 years defendant was convicted of a felony. The State thereby impeached him with a prior felony conviction.

¶ 35    The jury found defendant guilty of violating the order of protection on August 16, 2020, as charged.

¶ 36    The circuit court sentenced him to imprisonment for 5½ years, ordering that the sentence would run concurrently with the five-year prison sentence previously imposed in Woodford County case No. 20-CF-113 (the case pertaining to the August 15, 2020, phone calls).

¶ 37    Defendant moved for a reduction of the sentence in this case. He argued it was unfair of the circuit court to sentence him to a prison term six months longer than the prison term imposed in the other case, considering that the phone call he made in this case was little different from the phone calls he made in the other case.

¶ 38    The circuit court was unpersuaded by defendant's argument. The court reasoned:

"I think it is a worse situation to continue to commit felony offenses. So if you commit a felony offense on day one and then you turn around on day two and commit another felony offense, I think that's worse. When they're the same exact offense against the same exact victim, it is worse. And so the motion to reconsider the sentence is denied."

¶ 39    This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41                          A. The August 15, 2020, Phone Calls

¶ 42        Under Illinois Rule of Evidence 404(a) and (b) (eff. Jan. 1, 2011), propensity evidence is generally inadmissible. In other words (with some statutory exceptions inapplicable to this case), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Defendant maintains that evidence of the August 15, 2020, phone calls was inadmissible propensity evidence, the purpose of which was to suggest (1) it was in his character to disobey an order of protection and (2) on August 16, 2020, he acted in conformity with that character. See *id.*

¶ 43        But a defendant's commission of other, uncharged bad acts can have relevance beyond proof of character. Illinois Rule of Evidence 404(b) (Jan. 1, 2011) provides that evidence of other bad acts "may *** be admissible for other purposes"—that is, for purposes other than proving propensity—"such as proof of *** knowledge." The circuit court ruled that the August 15, 2020, phone calls were relevant to prove that defendant knew about the order of protection. If, in those phone calls, he tried to talk Krutke into getting the order of protection rescinded, he had to know that the order of protection existed. Thus, the August 15, 2020, calls were relevant proof of his *mens rea*, his guilty knowledge.

¶ 44        As the circuit court recognized, though, a finding of relevance "for other purposes" is not the end of the analysis. *Id.* Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 45        Defendant argues that although the August 15, 2020, phone calls "may have been relevant to show knowledge" (see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), "the inclusion of the full calls was prejudicial when only several, short portions of the calls would have been relevant to that point" (see Ill. R. Evid. 403 (eff. Jan. 1, 2011). Even the relevant portions of the calls were, in defendant's view, cumulative (see *id.*), "add[ing] nothing to what was already before the jury" (*People v. Ortiz*, 235 Ill. 2d 319, 335 (2009)). Defendant maintains that, "by way of other, less prejudicial testimony," "the State could have proven"—and did prove—his "knowledge of the order of protection." For instance, Suttles testified that when serving upon defendant the order of protection, he explained to defendant that "any third-party contact" with Krutke was forbidden. Also, according to defendant, "the August 16 phone call *** included a reference to the prohibitions within the order of protection, particularly when [defendant] was talking to the third party."

¶ 46        Those arguments would have to overcome the great deference we owe to the circuit court's findings of relevance and a lack of unfair prejudice. "The determination as to whether evidence is relevant and admissible is within the sound discretion of the trial court, and its ruling will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Gonzalez*, 379 Ill. App. 3d 941, 948-49 (2008). Abuse of discretion is the most deferential standard of review recognized by the law. *In re D.T.*, 212 Ill. 2d 347, 356 (2004). A ruling is an abuse of discretion only if the ruling "was arbitrary, made without conscientious judgment, or otherwise made in such a way that, in view of all of the circumstances, the [trial] court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (Internal quotation marks omitted.) *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 59.

¶ 47 Keeping in mind that deferential standard of review, so described, we now take up defendant's arguments against the circuit court's evidentiary ruling. Again, his arguments are basically twofold.

¶ 48 First, defendant argues that the possible relevance of some small portions of the August 15, 2020, phone calls did not justify the wholesale admission of those calls. He complains that most of what was said in those calls was irrelevant and inadmissible. He notes:

> "The August 15 phone calls added an additional 44 minutes and 20 seconds of evidence for the jury to hear. [Citations to record.] The calls contained information about [defendant's] mental health and the treatments he was receiving, as well as information about the state of his relationship with Krutke, and brief references to the order of protection."

¶ 49 Defense counsel, however, objected to the August 15, 2020, phone calls in their entirety. He did not take the position that those calls were mostly inadmissible. Instead, he took the position that because those calls were the subject of a different criminal case, they were completely inadmissible.

¶ 50 If a party objects to evidence "as a unit" and if the evidence "is admissible in part and inadmissible in part, the trial court is justified in overruling the objection and admitting the evidence in its entirety." 11 Timothy J. Storm, Illinois Practice, Courtroom Handbook on Illinois Evidence § 103:3(c) (2022) (citing *Richman Chemical Co. v. Lowenthal*, 16 Ill. App. 2d 568, 575-76 (1958)). Unless the evidence is totally inadmissible, the objecting party must specify the parts that are inadmissible and must request that those parts "be excluded from the consideration of the jury." *Aetitus v. Spring Valley Coal Co.*, 246 Ill. 32, 37-38 (1910). If, instead of distinguishing the inadmissible parts from the admissible parts, the party objects to the evidence in its entirety, the

circuit court should overrule the objection because, contrary to the objection, the evidence is not inadmissible in its entirety. By an incorrect across-the-board objection, the party will have forfeited any objection to the inadmissible parts. See *id*; *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (holding that both a contemporaneous objection and a posttrial motion raising the issue are necessary to preserve an issue for appeal).

¶ 51         As defendant concedes, the parts of the August 15, 2020, phone calls that manifested his knowledge of the protective order arguably were relevant evidence of *mens rea* in the present case. He could have knowingly violated the order of protection only if he knew about the order of protection. See 720 ILCS 5/12-3.4(a)(1) (West 2018) (providing that "[a] person commits violation of an order of protection if *** he or she knowingly commits an act which was prohibited by a court"). Because the August 15, 2020, phone calls contained material manifesting his knowledge of the order of protection, those phone calls were not, as he objected, *completely* irrelevant. By his nonspecific objection to the August 15, 2020, phone calls in their entirety, defense counsel forfeited any objection to the irrelevant portions of those phone calls. See *Enoch*, 122 Ill. 2d at 186; *Aetitus*, 246 Ill. at 37-38; *Richman Chemical*, 16 Ill. App. 2d at 575-76.

¶ 52         Second, defendant argues that, through Suttles's testimony and the August 16, 2020, phone call, the State presented adequate evidence of defendant's *mens rea*. Hence, defendant reasons, the other-crimes evidence in the form of the August 15, 2020, phone calls was unnecessary, and the probative value of those phone calls was substantially outweighed by the danger of unfair prejudice, namely, the temptation to regard those calls as propensity evidence. See Ill. R. Evid. 403 (eff. Jan 1, 2011).

¶ 53         Suttles did indeed testify that he served the order of protection on defendant. Suttles, however, was impeached by defense counsel's cross-examination. At first, Suttles testified

that when serving the order of protection on defendant, he warned defendant that third-party communication with Krutke was forbidden. When defense counsel asked Suttles how he knew he had so warned defendant, Suttles answered that a no-communication provision was in the order of protection he had served on defendant and that he always read the order of protection to the recipient—"word for word," without any changes. But then defense counsel asked Suttles to point out the no-communication provision in People's exhibit No. 2. Suttles was unable to find any such provision. Consequently, the State went into damage control by giving Suttles an opportunity to do some backpedaling. On redirect examination, Suttles testified that, regardless of what the order of protection said, he routinely did an add-on: he warned the person he was serving not to try any third-party communications—even though Suttles previously testified it was his practice to read the order of protection *verbatim*, without any alterations.

¶ 54      So, Suttles had no independent recollection of the order of protection in any detail, and he could have been understood as contradicting himself. These arguable discrepancies in Suttles's testimony could have opened the State up to a contention that Suttles should not be believed in his testimony that he served the order of protection on defendant. (Later, in his testimony in the defense's case in chief, defendant acknowledged that the order of protection was served upon him. In its preceding case in chief, however, the State did not yet have the benefit of defendant's testimony.) Given the possible vulnerabilities of Suttles's testimony, the State could have reasonably decided it would be prudent to present evidence, in the form of defendant's own recorded words from August 15, 2020, that he knew about the order of protection.

¶ 55      Defendant represents that "the August 16 phone call also included a reference to the prohibitions within the order of protection, particularly when [defendant] was talking to the third party." Actually, the part of the phone recording that defendant cites in this context appears

to contain no mention of the order of protection. Rather, in the cited part of the recording, defendant requested a man to give Krutke defendant's inmate account number so that "y'all" could deposit $20 into the account. The man asked defendant, "You know that three-way stuff don't work on this?" Defendant responded, "Yeah, it do because I talked to her yesterday." It does not seem that, in this particular cited exchange, the participants in the phone conversation explicitly discussed the order of protection. As defendant agrees, however, he directly referenced the order of protection in his telephone conversations on August 15, 2020.

¶ 56    Not only did the August 15, 2020, phone calls directly show defendant's knowledge of the order of protection, but, arguably, those phone calls indirectly showed his knowledge and understanding of the no-communication provision in the order. The repeated three-way calling could be regarded as a trick to at least temporarily evade the block the jail had placed on calls from defendant to Krutke. Granted, defendant offered an explanation for the three-way calling—he wanted his parents to pay for the calls—but the jury did not have to believe his explanation.

¶ 57    For all those reasons, then, we find no abuse of discretion in the overruling of defendant's objection to his recorded telephone communications with Krutke on August 15, 2020.

¶ 58                    B. The Sentence

¶ 59    Defendant challenges the sentence of 5½ years' imprisonment as too severe. He complains that, in the sentencing hearing, the circuit court "listed several factors in aggravation[ ] but failed to list *any* factors in mitigation." (Emphasis in original.)

¶ 60    The defendant made a similar complaint in *People v. Bergman*, 121 Ill. App. 3d 100, 109 (1984). The defendant in that case complained that although "trial judge did go into considerable detail in articulating her reasons for [the] defendant's lengthy sentence," the judge "failed to comment on the evidence in mitigation." *Id.* The appellate court responded:

"[W]here mitigation evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary. [Citations.] Where a sentencing judge articulates factors in aggravation, as in the instant case, a court of review may assume the trial judge properly considered factors in mitigation." *Id.*; see also *People v. Laliberte*, 246 Ill. App. 3d 159, 178 (1993) (holding that "[w]here a sentencing judge articulates factors in aggravation, *** a court of review may assume the trial judge properly considered factors in mitigation").

Thus, under *Bergman*, the circuit court's enumeration of only aggravating factors does not rebut the presumption that the court also took into account any mitigating evidence that was presented in the sentencing hearing.

¶ 61        Besides, as the State points out, it is false that the circuit court "failed to list *any* factors in mitigation." (Emphasis in original.) Defendant argues, on appeal, that his military service, which ended in an honorable discharge, was a factor in mitigation. The circuit court said, "The court has considered the defendant's veteran status." Also, the court expressly mentioned the mitigating factors that "the defendant's criminal conduct did not cause nor threaten serious physical harm to another" and that "[t]he defendant would not have contemplated that his criminal conduct would cause or threaten serious physical harm to another." See 730 ILCS 5/5-5-3.1(a)(1) (West 2020). The court also said it had considered the presentence investigation report, thereby signifying the court had taken into account defendant's mental health problems, drug addiction, family circumstances, employment history, and any other mitigating evidence set forth in that report. "Where the sentencing court examines a presentence report, it is presumed that the court

considered the defendant's potential for rehabilitation." *People v. Wright*, 272 Ill. App. 3d 1033, 1046 (1995).

¶ 62        Arguably, the 29 prior convictions listed in the presentence investigation report suggest a poor potential for rehabilitation. Among the more serious offenses are embezzlement, car theft, attempted aggravated assault, domestic assault, and domestic battery. An extensive criminal history is a significant aggravating factor, showing that the defendant "is unwilling to learn from his mistakes or to respect laws enacted for the protection of the public's safety." *People v. Rader*, 272 Ill. App. 3d 796, 807 (1995). Also, as the circuit court remarked in the sentencing hearing in this case, impunity might be further perceived in the repetition of the offense against the same victim.

¶ 63        Thus, we are unable to say the circuit court abused its discretion by imposing a prison sentence that was six months short of the maximum extended term. See *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000); 720 ILCS 5/12-3.4(d) (West 2020) (providing that "[v]iolation of an order of protection is a Class 4 felony if the defendant has any prior conviction under this Code for domestic battery [(720 ILCS 5/12-3.2 (West 2020))]"); 730 ILCS 5/5-5-3.2(b)(1) (West 2020) (providing that an extended term sentence may be imposed on any defendant who "is convicted of any felony, after having been previously convicted in Illinois or any other jurisdiction of the same or similar class felony or greater class felony, when such conviction has occurred within 10 years after the previous conviction, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts"); 730 ILCS 5/5-4.5-45(a) (West 2020) (providing that "[t]he sentence of imprisonment for an extended term Class 4 felony *** shall be a term not less than 3 years and not more than 6 years").

¶ 64                                III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 66    Affirmed.